**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH M. SISKY, | ) | |
| | ) | CASE NO. 5:15-CV-1208 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 13).

The issue before the undersigned is whether the final decision of the Acting Commissioner of

Social Security ("Commissioner") denying Plaintiff Elizabeth M. Sisky's ("Plaintiff" or "Sisky")

application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423 *et seq*., is supported by

substantial evidence and, therefore, conclusive.

For the reasons set forth below, this Court AFFIRMS the final decision of the

Commissioner.

## I.  Procedural History

Plaintiff filed applications for POD and DIB in January of 2012.  (Tr. 124).  Plaintiff

alleged she became disabled on December 16, 2011.  (*Id.*)  The Social Security Administration

denied Plaintiff's application on initial review and upon reconsideration.  (Tr.  97, 103).

At Plaintiff's request, an administrative law judge ("ALJ") convened an administrative

hearing on January 9, 2014 to evaluate her application.  (Tr. 18-28).  Plaintiff, represented by

counsel, appeared and testified before the ALJ.  (*Id*).  A vocational expert ("VE") also testified.

(*Id*).

On January 30, 2014, the ALJ issued an unfavorable decision, finding Plaintiff was not

disabled.  (Tr. 18-28).  After applying the five step sequential analysis,[1] the ALJ determined

Plaintiff retained the ability to perform her past relevant work as a receptionist, as well as other

jobs that existed in significant numbers in the national economy, and, therefore, she was not

---

[1]  The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id*. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id*. § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id*. § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id*. § 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

under disability at any time through March 31, 2013, the date last insured. (*Id*). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 14). The Appeals Council denied the request for review, making the ALJ's determination the final decision of the Commissioner. (Tr. 1-3). Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 1383(c)(3).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in July of 1974 and was 36 years old on the alleged onset date, making her a "younger person" for Social Security purposes. (Tr. 26); 20 C.F.R. § 404.1563(c). Plaintiff has past relevant work as a receptionist. (Tr. 26). Plaintiff has at least a high school education. (Tr. 26, 42).

### B. Medical Evidence

#### 1. Treatment History

On July 27, 2011, Sisky was seen by Robert Bermel, M.D., a neurologist at the Neurological Institute's Mellen Center for Multiple Sclerosis. (Tr. 276-83). Dr. Bermel noted that Sisky had an MRI of the brain 6 years earlier, that was "fine." (Tr. 276). Her current symptomology included right foot drop, left leg weakness, right leg numbness, impaired mobility in the back and hips, and urinary frequency/urgency. (Tr. 277). On examination, Sisky scored 5/5 strength in all categories associated with her upper extremities and 4/5 or higher in all categories associated with the lower extremities, except for toe extension (3/5). (Tr. 278). Sisky scored "+++" in all reflexes; had normal sensory examination except for mildly diminished senses in the lower extremities; and her gait was mildly abnormal with inability to heel walk and

3

difficulty tandem walking. (Tr. 278-79). Dr. Bermel reviewed an MRI performed on July 5, 2011, noting the presence of "T2 lesions in the brain in the periventricular and subcortical distribution, some of them are flame-shaped consistent with multiple sclerosis (MS) and moderate lesion burden." (Tr. 279). He also noted that, in the cervical spine, there were at least 5 or 6 discrete patchy areas of T2 hyperintensity consistent with MS, as well as one discrete lesion in the thoracic cord. (*Id*.) Her neurological examination revealed "bilateral lower extremity spasticity, bilateral hip flexor weakness and a right foot drop, all likely related to multiple sclerosis." (*Id*.) Dr. Bermel also ordered a rehabilitation consult including physical therapy and a psychiatry visit. (*Id*.)

On August 1, 2011, Sisky began a three-day course of IV Solu-Medrol treatment with a twelve-day oral prednisone taper. (Tr. 284-288). On August 24, 2011, it was noted that Sisky's right foot drop, left leg weakness and right leg numbness slightly improved with the steroid treatment. (Tr. 289). Dr. Bermel and a nurse practitioner formulated a plan "to start Gilenya for disease modifying therapy," and initiated startup testing. (Tr. 288-89).

On October 7, 2011, Sisky was seen by a physical therapist, who noted she had an abnormal gait or episodic imbalance (Tr. 212) and that Sisky had complained about a gait disturbance since 2009. (Tr. 211).

Also on October 7, 2011, Sisky was seen by Francois Bethoux, M.D. (Tr. 215-221). Dr. Bethoux diagnosed dysarthria, ataxia, migraine headaches, normal pregnancy, and dysphonia. (Tr. 215). Sisky reported that she had no problems driving 90 percent of the time, but noted a time when she drove a long distance and had to physically lift her leg with her hands to operate the pedals. (Tr. 216). Dr. Bethoux assessed spasticity, decreased mobility, decreased activities

4

of daily living performance, decreased balance, decreased coordination/quality of movement, and fatigue.  (Tr. 219).

On October 18 2011, Sisky began Gilenya therapy for MS. (Tr. 222).

On January 31, 2012, Dr. Bermel noted Sisky was on Gilenya therapy, screened for macular edema, and evaluated for retinal pathology.  (Tr. 225).  Test results were normal.  (*Id*.)  On the same date, a nurse practitioner noted Sisky had significant depression and rambling speech.  (Tr. 228).

On February 6, 2012, Dr. Bermel noted that Sisky was tolerating Gilenya therapy well, but having social issues related to quitting her job.  (Tr. 227).  Dr. Bermel noted that "[d]uring [a] lengthy conversation with her there was evidence for impulsivity, circumstantial thought, and she reports formed visual  hallucinations at least one occasion."  (*Id*.)  He recommended a psychiatric and psychological opinion concerning these symptoms.  (*Id*.)

On March 23, 2012, Sisky was seen by a physician's assistant, who noted normal fine movements in the hands bilaterally, no spasms, an abnormal gait, and severe spasticity.  (Tr. 259).

On May 10, 2012, at Dr. Bermel's request, Sisky underwent a psychological evaluation performed by Amy Sullivan, Psy. D.  (Tr. 265).  Sisky was diagnosed with mood disorder associated with her medical condition and ascribed a Global Assessment of Functioning ("GAF") score of 61.[2]  (Tr. 268).

---

[2]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.

On July 17, 2012, Sisky was seen by Keith McKee, M.D. (Tr. 269).  He assessed abnormal involuntary movements, MS with severe spasticity but improved since her last visit, and abnormal gait.  (Tr. 272).  Sisky's prescription for Baclofen was increased, and daily stretching exercises were prescribed.  (*Id*.)  On the same date, a nurse practitioner noted that Sisky restarted Gilenya treatment in April of 2012 after one treatment interruption due to a change in insurance coverage.  (Tr. 301).  She was tolerating the treatment well without side effects.  (*Id*.)

On August 3, 2012, Dr. Bermel noted that Sisky's MRI was stable from her prior one, and that Sisky was tolerating Gilenya treatment well.  (Tr. 301).  He stressed the importance of maintaining an adequate supply of Gilenya.  (*Id*.)

On October 11, 2012, at Dr. Bermel's referral, Sisky underwent a physical therapy functional capacity evaluation (FCE) performed by physical therapist Matthew Sutliff.  (Tr. 307-313).  The reason for the referral was that Sisky had twice been denied social security disability benefits.  (Tr. 307).  Sisky indicated her goal was to reapply for benefits.  (Tr. 308).  Mr. Sutliff opined that the test was valid as there was no evidence of symptom magnification.  (Tr. 312). Much of the examination was based on Sisky's self-reporting, including Sisky's statements as to her levels of fatigue, pain, frequency of spasms, neuropsychological limits, and functional limits. (Tr. 308-309).  For example, Sisky reported that she could stand for 1 minute and sit for 30 minutes.  (Tr. 309).  Objective testing resulted in range of motion within normal limits bilaterally

---

DSM-IV at 34.  It bears noting that an update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

in the upper and lower extremities.  (Tr. 309).  In her upper extremities, Sisky exhibited 4/5 or 5/5 strength in all categories with grip strength greater than or equal to 50 pounds in both hands. (Tr. 309).  In her lower extremities, Sisky exhibited 3/5 or 4/5 strength in all categories.  (*Id.*) Her gait was ataxic and spastic, and she was unstable on stairs and ramps.  (Tr. 310).  Her right grip percentile rank was 15; her left grip percentile rank was 23.  (Tr. 310-11).  She had moderate impairment with coordination, left greater than right.  (Tr. 310).  Mr. Sutliff essentially opined that Sisky met Listing 11.09 for Multiple Sclerosis, as he believed she had: (1) significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station; and (2) significant, reproducible fatigue of motor function with substantial motor weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.[3]  (Tr. 312).  Mr. Sutliff opined that the following physical factors would impair Sisky's ability to work: (1) gait instability with falls, combination of ataxic, paretic, and spastic in quality; (2) balance disorder; (3) incoordination of bilateral hands; (4) weakness of grip and dropping of items and limited lifting ability; (5) weakness of legs and minimal right toe clearance and tripping risk; (6) fatigue of motor function; (7) bowel and bladder dysfunction; (8) left leg pain along sciatic distribution, more likely neuropathic in nature.  (Tr. 312, 335).  He asserted that Sisky could sit frequently; stand, walk, and reach overhead occasionally; and bend, squat, crawl, and climb stairs infrequently.  (Tr. 313).

---

[3]  This language used by Mr. Sutliff repeats nearly verbatim the language of the Listing 11.09 criteria.

On October 30, 2012, a nurse practitioner noted that Sisky again stopped Gilenya treatment on September 21, 2012 because of insurance reasons.  (Tr. 316.)  The nurse practitioner noted Sisky had obtained an FCE, which supports disability.  (Tr. 317).  A second brain MRI from the same date was grossly similar to the prior MRI from July of 2011. (Tr. 305).

On August 21, 2013, a nurse practitioner noted that Sisky had not been seen since October 30, 2012, and that she still had not resumed Gilenya treatment.  (Tr. 339).  It was noted that Sisky had another course of steroids in July of 2013 because of worsening ambulation, weakness and fatigue.  (*Id*.)  No new MS symptoms were reported.  (*Id*.)  Sisky did, however, report fatigue, leg stiffness, difficulty walking and the use of a cane.  (*Id*.)

On February 19, 2014 – after the ALJ's January 30, 2014 decision – Dr. Bermel's treatment notes include a notation that Mr. Sutliff "previously found her to be disabled, and physical symptoms of MS have progressed/worsened since then."  (Tr. 7).  Dr. Bermel did not indicate whether he reviewed or agreed with Mr. Sutliff's assessment.  (*Id*.)

**2.  State Agency and Consultative Examinations**

On April 17, 2012, Sisky was referred for a clinic interview with psychologist Hershchel Pickholtz, ED. D., in order to assess her current mental condition and psychological status.  (Tr. 240).  Dr. Pickholtz found no impairment in four broad categories of mental functioning and assigned a GAF score of 71. (Tr. 246-47).

**C.  Hearing Testimony**

At the January 9, 2014 hearing, Plaintiff testified to the following:

- She is 5'8" tall and weighs 135 pounds.  She is right-handed.  (Tr. 40).

- She is married and has three children who live with her ages 18, 13, and 4.

8

Another child is 20 years old and no longer lives with her.  (*Id.*)

• She has a valid driver's license and drives her 4-year-old to preschool 3 days a week.  Otherwise, her husband or older daughter drives.  (Tr. 41-42).

• She graduated from high school and attended Cuyahoga County Community College for one quarter.  (Tr. 42).

• The last job she had was at Time Warner as a customer service representative from March of 2011 until December of 2011.  (Tr. 42-43).  She left because she had to call off frequently due to the symptoms of multiple sclerosis.  (Tr. 43).

• She also worked as an accounts payable clerk.  (Tr. 44-45).  She held other jobs sporadically at Papa John's, as a factory assembler, and even worked as a bank teller.  (Tr. 45-46).  She also worked in customer service for Cleveland Electric between 1998 and 2001.  (Tr. 46).

• She believed she could not perform any type of work due to fatigue and an inability to work on any task for a sustained basis.  (Tr. 49).

• She has to take breaks while making dinner, does not clean or do laundry, but does fold the laundry.  (Tr. 49-50).  She stopped cleaning about one year earlier. (Tr. 50).  She makes her bed daily and puts dishes in the dishwasher.  (*Id.*)

• She described her 4-year-old as "pretty self-sufficient," but does feed, bathe, and dress her.  (Tr. 50).

• She has no hobbies and the family rarely goes out.  (Tr. 51-52).

• Her 18-year-old daughter does most of the family's grocery shopping, though she will accompany her when there is a lot to buy.  (Tr. 52).

• She was on Gilenya therapy on her doctor's orders.  (Tr. 52-53).  She did not feel that it was helping her symptoms; her understanding is that the therapy is intended to prevent her symptoms from becoming worse.  (Tr. 53).

• Beyond fatigue, she has balance issues and experiences stiffness and burning in her left leg.  She has burning without the stiffness in her right leg as well.  (Tr. 53).

• She stated that the muscles on the left side of her face are in "hyperactivity mode," and she experiences Charlie horses on the left side of her neck which she described as "paralyzing while it lasts."  (Tr. 53-54).

9

- At times, her speech and writing will slow down, and she has problems recalling words.  (Tr. 54-55).

- She has been prescribed Baclofen, a muscle relaxer.  (Tr. 55).  She started using a cane in April of 2013, but it was not prescribed.  (Tr. 55-56).  Her doctors have, however, recommended the use of an assistive device.  (Tr. 63).  She has fallen on occasion.  (Tr. 56).

- She can stand for 2 to 3 minutes before she starts teetering and needs to sit down. She has no issues sitting, but does need to get up and move around after sitting for approximately 40 minutes.  (Tr. 57-58).

- She can still pick up her 4-year-old child, who weights approximately 45 pounds. (Tr. 58).

- The most she walks is about 20 feet.  At the grocery store, she uses a scooter.  (Tr. 59).

- She has problems with frequent urination.  (Tr. 59-60).

- She has difficulty manipulating objects with her hand and frequently drops things such as dishes or silverware.  (Tr. 61).

- She can dress herself, but avoids clothes with buttons.  (Tr. 62).

- She receives help from her family with respect to preparing meals, and has difficulty cutting.  (Tr. 62).

The VE classified Plaintiff's past relevant work as follows: customer complaint clerk, Dictionary of Occupational Titles ("DOT") § 241.367-014, sedentary exertional level with an SVP of 5; accounting clerk, DOT § 216.482-010, sedentary per the DOT but light as performed with an SVP of 5; receptionist, DOT § 237.367-038, sedentary per the DOT but light as performed with an SVP of 4; and, teller, DOT § 211.362-018, light with an SVP of 5.  (Tr. 67-69).

The ALJ proceeded to pose the following hypothetical to the VE:

10

> All right, let's assume an individual who can do a range of sedentary work, [and] like occasional pushing and pulling with low foot and hand controls. Frequent overhead reaching, bilaterally. Frequent handling and fingering bilaterally. Occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling. No exposure to unprotected heights, moving mechanical parts, or operation of a motor vehicle such as commercial driving. Avoid concentrated exposure to both heat – extremes of heat and cold. Would the individual be able to perform any of that past work?

(Tr. 69-70).

The VE testified that such an individual could perform the accounting clerk job and receptionist jobs as generally performed in the national economy per the DOT, but not as the claimant actually performed it. (Tr. 70). With respect to the customer complaint clerk and customer service representative positions, the VE testified that the hypothetical individual could perform that job both as typically performed in the national economy and as claimant performed it. (*Id*.) Finally, the VE indicated that the hypothetical individual would be unable to perform the teller job. (*Id*.)

In addition, the VE identified three jobs as representative examples that a hypothetical person with the above limitations could perform: charge account clerk, DOT § 205.367-014, sedentary with an SVP of 2 (350 jobs locally, 1,400 in Ohio, and 33,000 nationally); addresser, DOT § 209.587-010, sedentary with an SVP of 2 (400 jobs locally, 1,300 in Ohio, 35,000 nationally); and document preparer, DOT § 249.587-018, sedentary with an SVP of 2 (350 jobs locally, 1,500 in Ohio, 40,000 nationally). (Tr. 70-71). The VE indicated that his testimony was consistent with both his experience as well as the DOT. (Tr. 71).

The ALJ proceeded to pose a second hypothetical to the VE:

For this next hypothetical, let's assume the individual could continue to do all that

11

work as described in hypothetical one at the sedentary level, however the
individual would take excessive breaks beyond the customary two plus lunch, or
might miss more than two days per month because of illness associated with the
MS symptoms.  Would such an individual be able to maintain full-time
employment?

(Tr. 71).

The VE responded that such an individual was unemployable, as missing more than one

day per month would not be tolerated.  (Tr. 72).

Plaintiff's counsel also posed a hypothetical question to the VE with the following

parameters:

Assume for this hypothetical a person's limited to sedentary work with the
additional limitations of occasional bilateral manipulation and fingering,
or handling and fingering.  Limited to push, pull with hands by 20 pounds push,
five pounds pull.  Limited to infrequent, defined as less than two percent,
squatting, crawling, climbing stairs, or bending.  Limited to occasional reaching
overhead.  Limited – requires close access to a restroom, and requires the use of
one hand – requires the use of a one-handed assistive device while walking or
standing.  Would any jobs be available?

(Tr. 72-73).

The VE responded that there would be no jobs available for such an individual.  (Tr. 73).

### III.  Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law in her January 30,

2014 decision:

1.   The claimant last met the insured status requirements of the Social
     Security Act (the "Act") on March 31, 2013.

2.   The claimant did not engage in substantial gainful activity during the
     period from her alleged onset date of December 16, 2011 through her date
     last insured of March 31, 2013 (20 CFR 404.1571 *et seq.*).

3.   Through the date last insured, the claimant had the following severe

12

impairment: multiple sclerosis (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant may occasionally push and/or pull, including the operation of hand and foot controls, with the bilateral upper and lower extremities; the claimant may frequently finger, handle and reach overhead with the bilateral upper extremities; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to extremes of heat and cold, and all exposure to workplace hazards, including unprotected heights, moving mechanical parts and operation of a motor vehicle.

6.   Through the date last insured, the claimant was capable of performing past relevant work as a receptionist (DOT#237.367-038), having a sedentary exertional level designation and a specific vocational preparation factor of four.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from December 16, 2011, the alleged onset date, through March 31, 2013, the date last insured (20 CFR 404.1520(1)).

(Tr. 20-28).

## IV.  Disability Standard

A claimant is entitled to receive a Period of Disability, Disability Insurance Benefits or

Supplemental Security Income benefits only when she establishes disability within the meaning

of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when

she cannot perform "substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 20 C.F.R. §§ 404.1505, 416.905(a).

## V.  Standard of Review

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kennedy v. Astrue*, 247 Fed. App'x 761, 2007 WL 2669153, at *3 (6th Cir. 2007); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed. (*Id.*)

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *See Kennedy*, 247 Fed. App'x 761, 2007 WL 2669153, at *3; *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final

decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  Analysis

Sisky claims the ALJ erred by: (1) failing to incorporate limitations into the RFC stemming from her symptoms; and (2) failing to give proper weight to a functional capacity evaluation (FCE) completed by a physical therapist.  Each will be discussed in turn, but the Court addresses the second assignment of error first.

### A.  Functional Capacity Evaluation of Physical Therapist Sutliff

Sisky contends that the ALJ failed to appropriately evaluate the functional capacity evaluation (FCE) performed by a physical therapist, Mr. Sutliff, which was performed at the behest of her treating doctor, Dr. Bermel.  (Doc. 15 at pp. 10-13)  Mr. Sutliff essentially opined that Sisky met Listing 11.09 for MS.  (Tr. 312.)

As a physical therapist, Mr. Sutliff does not constitute an "acceptable medical source" with the meaning of the regulations, but rather only qualifies as an "other source."  *Compare* 20 C.F.R. § 404.1513(a) with § 404.1513(d)(1); *see also Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. App'x 358, 363 (6th Cir. 2001) (report not afforded significant weight because a physical therapist is not recognized as an acceptable medical source); *accord Turner v. Colvin*, 2015 WL 5474081, at *5 (E.D. Ky. Sept. 16, 2015) ("Because physical therapists are not considered acceptable medical sources under the regulations, the ALJ was not required to give any special deference to the physical therapist's RFC findings.").  Nevertheless, Social Security Ruling ("SSR") 06-03p, 2006 SSR LEXIS 5, explains how the Commissioner should address opinions from sources that are not "acceptable medical sources," but rather "other sources."  Among these "other sources" are therapists, nurse practitioners, and school teachers. 2006 SSR LEXIS 5, at *4,

15

[WL] at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function.  (*Id*.)

> Additionally, SSR 06-3p states:
>
> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p, 2006 SSR LEXIS 5 at *15-16, 2006 WL 2329939, at *6.  The same SSR also sets forth the factors to be considered when evaluating opinion evidence from medical sources that are not "acceptable medical sources."  These factors include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, specialization, and how well the source explains the opinion.  *Id*.  The ALJ addressed Mr. Sutliff's opinion as follows:

> Although not received of an acceptable medical source [20 CFR 404.1513(a)], the following opinion was nevertheless considered, pursuant to 20 CFR 404.1513 (d)(1).[4]
>
> Little weight was accorded the opinion of Matthew Sutliff, PT, that the claimant meets the criteria for listing 11.09, could perform less than sedentary work, and was consequently disabled.  Mr. Sutliff tested the claimant with the use of objective exercises and was reporting within the bounds of his professional certifications; however, considerations of the effects of SSR 96-5p aside, the claimant's stated goal for the testing [to reapply for Social Security Disability

---

[4]  In her brief, the Commissioner incorrectly asserts that the ALJ considered Mr. Sutliff's FCE as though it was from a treating source.  (Doc. 18 at p. 9).

Insurance] (5F/33), and the essentially normal physical examinations (5F/27),
(7F/2) that bracket this evaluation diminish, considerably, its persuasiveness.

No other treating or examining physician or other medical health provider
rendered an opinion relevant to the formulation of the residual functional capacity.

(Tr. 25.)

Here, the ALJ not only clearly considered Mr. Sutliff's opinion, but she *explained* her

reasons for ascribing it little weight.  The *explanation* requirement should not be construed as

rigorously as the treating physician rule, which applies only to "acceptable medical sources."

*Jefferson v. Colvin*, 2015 U.S. Dist. LEXIS 94716 (N.D. Ohio 2015) (White, M.J.) ("[the]

explanation requirement should not be confused with the standard required for the weight

ascribed to treating sources.") (citations omitted).  While Sisky suggests it was erroneous for the

ALJ to discount Mr. Sutliff's opinion because the evaluation was conducted for the purposes of

obtaining disability benefits rather than for treatment, she cites no authority supporting her

position.  (Doc. 15 at p. 13).  The ALJ also pointed to "essentially normal" physical examinations

in the medical record from July 17, 2012 (a few months before the FCE) and August 21, 2013

(almost 10 months after the FCE) as undermining the persuasiveness of Mr. Sutliff's opinion.

(Tr. 25, *citing* Tr. 301-302, 339-340).  Both of those medical visits document, among other

things, moderate fatigue; zero pain on a ten-point scale; normal cardiovascular, pulmonary,

endocrine, and hematologic systems; normal mental status examinations; and no falls in the past

month.  (Tr. 301-302, 339-340).  The latter examination also documents 5/5 strength in all areas

of the lower and upper extremities, only mild stiffness/spasticity in the lower extremities, and an

ability to perform heel and toe walking, as well as tandem walking, though not without some

difficulty.  (Tr. 340).  While Sisky may disagree with the ALJ's explanation, her disagreement

17

with the ALJ's rationale does not provide a basis for remand.

Finally, Sisky suggests that Mr. Sutliff's opinion should have been accorded the same weight as that of a treating, acceptable medical source, because Dr. Bernel "ordered and endorsed" the FCE. (Doc. 15 at p. 11). Sisky cites no law suggesting that an FCE performed by an "other source" is the equivalent of a treating physician's opinion merely because the FCE was ordered by a treating physician. (*Id*.) Furthermore, Sisky's assertion that Dr. Bermel "endorsed" the FCE is simply inaccurate. As stated in the recitation of the medical history, on February 19, 2014, Dr. Bermel's treatment notes include a statement that Sisky was appealing her disability denial and that a "Detailed functional capacity evaluation here by Matt Sutliff 10 OCT 2012 previously found her to be disabled, and physical symptoms of MS have progressed/worsened since then." (Tr. 7). To interpret this notation as Dr. Bermel expressing either agreement with Mr. Sutliff's FCE or as his endorsement of the FCE's contents is unwarranted. Further, even if the Court were to credit Sisky's rather active interpretation of Dr. Bermel's February 19, 2014 treatment note, Sisky ignores the fact that the treatment note post-dates the ALJ's January 30, 2014 decision. The ALJ cannot reasonably be faulted for not construing Dr. Bermel's note as an "endorsement" of the FCE where the medical record in question did not yet exist.[5]

The Court finds that the ALJ has not erred, as she adequately explain the weight ascribed

---

[5] Sisky makes a similar argument with respect to a nurse practitioner's treatment note, which again merely acknowledged the existence of an FCE that supports disability. (Tr. 340). The treatment notes cannot reasonably be construed as endorsing the FCE. Moreover, nurse practitioners, just like physical therapists, are also considered "other sources" under the regulations and do not constitute "acceptable medical sources." As such, the nurse practitioner's alleged endorsement of the FCE would have no impact on the ALJ's obligation to explain the weight afforded to Mr. Sutliff's opinion, nor would it subject the FCE to the heightened standard of the treating physician rule.

to the opinion of an "other source."

**B. RFC Determination**

      In her other assignment of error, Sisky argues that the ALJ's RFC finding was not supported by substantial evidence because it did not incorporate all of her work-related functional limitations.  (Doc. 15 at pp. 9-10).

      Before moving to the fourth step in the sequential evaluation process, the ALJ must assess the claimant's RFC.  20 C.F.R. § 416.920(e).  The claimant's RFC signifies the claimant's remaining capacity to engage in work-related physical and mental activities despite functional limitations from the claimant's impairments.  20 C.F.R. § 416.945; *see also Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992).  "Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."  *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 578 (6th Cir. 2009)  Thus, it is ultimately the ALJ's responsibility to analyze the evidence of record and determine a claimant's RFC.  While the record may contain evidence supporting a more restrictive RFC assessment, the ALJ's ruling must be upheld where adequate evidence supports it.  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.") (*citing Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)).

      Sisky's rather perfunctory argument is encapsulated in one paragraph of her brief on the merits:

      In the instant case, the record is replete with substantial evidence, as defined by

19

these prevailing standards, to wholly support the plaintiff's complaints of fatigue (Tr. 223, 262, 301, 316), severe spasticity (Tr. 228, 257, 259, 272, 279), gait disturbance (Tr. 253, 259, 272), right drop foot (Tr. 279, 289), decreased range of motion, flexibility and strength, (Tr. 213, 219), and bladder frequency, hesitancy and urgency (Tr. 223, 228, 262, 289, 302, 316), which are all consistent with the medically determinable impairment of MS and substantiated by objective medical evidence; specifically brain and spinal MRIs and objective functional capacity testing. (Tr. 305, 307-314).  The ALJ failed to incorporate limitations resulting from these symptoms into the RFC, and did not give good reasons for the exclusion of these limitations. (Tr. 22).

(Doc. 15 at p. 10).

While Plaintiff recounts her symptoms, Plaintiff has neglected to identify a single *functional limitation* stemming from this panoply of symptoms that she believes should have been included in the RFC.  The RFC finding in this case is rather restrictive.  Among other limitations, it confines Sisky to sedentary work, which significantly reduces the amount of standing and walking required.  (Tr. 22).  Also, by definition, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  As such, the limitation to sedentary work significantly limits the lifting requirements of the RFC, which further notes only occasionally pushing/pulling with the bilateral upper and lower extremities.  (*Id*.)  Other limitations include only frequent (as opposed to constant or continuous) ability to finger, handle and reach overhead with the bilateral upper extremities.  (*Id*.)  Further limitations include the ability to only occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs; a prohibition against climbing ladders, ropes or scaffolds; and a prohibition against exposure to workplace hazards or concentrated exposure to extremes of heat and cold.  (*Id*.)

Here, Sisky has failed to make any argument as to how this rather restrictive RFC fails to

20

accommodate the symptoms she cites.  The ALJ is not required to incorporate into the RFC every symptom alleged by Plaintiff.  *See, e.g., Harris v. Barnhart,* 171 Fed. App'x 211, 214 (9th Cir. 2006) ("The ALJ is not required to accept every symptom of which a claimant complains as rising to the level of a functional limitation."); *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1270 (11th Cir. 2007) (explaining that an ALJ's hypothetical only needs to include a claimant's impairments and "not each and every symptom of the claimant"); *cf. Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.")

Because Sisky has failed to identify any additional functional limitations that were not included in the RFC, her argument that the RFC was not supported by substantial evidence is without merit.

### VII.  Conclusion

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.

/s/ Kenneth S. McHargh
U.S. Magistrate Judge

Date: August 19, 2016